IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| HILTON WORLDWIDE, INC. GLOBAL BENEFITS ADMINISTRATIVE COMMITTEE, *et al.*,      Plaintiffs,          v.      CAESARS ENTERTAINMENT CORPORATION,      Defendant. | ) ) ) ) ) ) ) ) ) )    Case No. 1:14-cv-1766 |

## MEMORANDUM OPINION

Among the various issues presented on a threshold dismissal and transfer motion in this breach-of-contract, unjust enrichment and ERISA[1] case are:

(1) Whether plaintiffs have alleged sufficient facts to hold a parent company liable for the alleged breaches of contract by its subsidiary where, as here, the parent company neither signed nor participated in the negotiation of the contracts and where, as here, the complaint lacks factual allegations to support a claim of alter ego liability or domination.

(2) Whether plaintiffs' unjust enrichment claim fails to state a claim upon which relief can be granted where, as here, plaintiffs' unjust enrichment claim is premised on violations of existing contracts.

(3) Whether plaintiffs have stated a valid claim under ERISA where, as here, the statutorily mandated minimum funding standard for the plan at issue has been satisfied and the complaint lacks factual allegations to support the claim that there is an immediate or imminent threat that the minimum funding standard will not be met.

(4) Whether plaintiffs' breach-of-contract and ERISA claims should be dismissed under Rule 12(b)(7), Fed. R. Civ. P., for failing to join a necessary and indispensable party to this action.

(5) Whether transfer of this case is appropriate under 28 U.S.C. § 1412, which implicates the following issues: (i) whether, if transferred, the instant case is related to an ongoing

---

[1] Employment Retirement Income Security Act, 29 U.S.C. ch. 18.

1

Chapter 11 proceeding in the bankruptcy court for the Northern District of Illinois such that if this case is transferred, that court will have jurisdiction over the transferred case; (ii) whether transfer pursuant to § 1412 is appropriate given that the instant case did not arise under Title 11; and (iii) assuming § 1412 applies, whether transfer of this case to the bankruptcy court for the Northern District of Illinois is in the interests of justice, would expedite administration of the bankruptcy estate, and avoid inconsistent legal rulings.

The parties have fully briefed and argued these issues, as well as other issues raised by defendant's dismissal motion. Thus, defendant's motion is now ripe for disposition.

## I.

The relevant facts are derived chiefly from plaintiffs' Amended Complaint, as required by the principle that in evaluating a motion to dismiss, a "court must accept as true all of the allegations contained in a complaint . . . ." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Other facts, as noted herein, are appropriately judicially noticed.[2]

- Plaintiff Hilton Worldwide, Inc. ("Hilton") is a corporation organized under the laws of Delaware with its principal place of business located in McLean, Virginia. Founded in 1919, Hilton is one of the largest hospitality companies in the world, operating chains of hotels in 91 different countries and territories. Amended Complaint ¶¶ 10-11.
- Plaintiff Hilton Worldwide, Inc. Global Benefits Administrative Committee ("GBAC") is the Named Fiduciary and Plan Administrator of the Hilton Hotels Retirement Plan (the "Plan"). Plaintiff Sheldon T. Nelson is a representative member of the GBAC, and both GBAC and Nelson are "fiduciaries" with respect to the Plan. Amended Complaint ¶ 7.
- Defendant Caesars Entertainment Corporation ("CEC") is a corporation organized under the laws of Delaware with its principal place of business located in Las Vegas, Nevada. CEC is a diversified casino-entertainment provider that owns, operates, or manages, through its subsidiaries, 52 casinos around the world. Amended Complaint ¶¶ 12-13.
- Caesars Entertainment Operating Company, Inc. ("CEOC") is a majority-owned subsidiary of CEC, as CEC owns 95 % of the shares of CEOC. CEOC is also a Delaware corporation with its principal place of business located in Las Vegas, Nevada, and provides casino entertainment services in 44 gaming and resort properties in the United States and five other countries. Amended Complaint ¶¶ 15-18.

---

[2] It is appropriate to take judicial notice of these facts because, in accordance with *Zak v. Chelsea Therapeutics Int'l, Ltd.*, No. 13-2370, 2015 WL 1137142 (4th Cir. Mar. 16, 2015), these facts are drawn from documents which are "integral to and explicitly relied on in the complaint" and the "plaintiffs do not challenge [the documents'] authenticity." *Id.* at *7 (internal quotation marks and citations omitted).

- On December 31, 1998, Hilton executed a Distribution Agreement with Park Place Entertainment Corporation ("Park Place"). The Distribution Agreement governed the "spin-off" of certain gaming operations, assets, and liabilities from Hilton to Park Place. Amended Complaint ¶¶ 24-25.

- Under the terms of the Distribution Agreement, Park Place agreed to indemnify Hilton "from and against any and all Indemnifiable Losses incurred or suffered by any of the Hilton Indemnitees and arising out of or due to the failure or alleged failure of Park Place, any Gaming Subsidiaries, or any of their respective Affiliates to pay, perform, or otherwise discharge in due course any of the Gaming Group Liabilities." Amended Complaint ¶ 27.

- The Distribution Agreement defines Indemnifiable Losses as "all losses, Liabilities, damages, and expenses (including, without limitation, the reasonable costs and expenses, including reasonable attorneys' fees, in connection with any such investigations, Actions, or threatened Actions)." Amended Complaint ¶ 28.

- The Distribution Agreement defines Hilton Indemnitees as "Hilton and each of the Retained Business Subsidiaries, and each of their respective past or present directors, officers, employees, agents and Affiliates and each of the heirs, executors, successors and assigns." Amended Complaint ¶ 29.

- The Distribution Agreement defines Gaming Group Liabilities as "[a]ll of the Liabilities of the Gaming Group under, or to be retained or assumed by Park Place or any of the Gaming Subsidiaries pursuant to this Agreement or any of the Related Agreements." Amended Complaint ¶ 30.

- The Distribution Agreement provides that the remedy for any breach of the Agreement would be "specific performance in addition to any other appropriate relief or remedy." Amended Complaint ¶ 31. It also notes that "each party waives any objection to the imposition of such relief." Amended Complaint ¶ 33.

- In connection with the spin-off, Hilton and Park Place also entered into an Employee Benefits and Other Employment Matters Allocation Agreement ("Allocation Agreement"). Under the terms of the Allocation Agreement, Hilton agreed to be responsible for the administration of the Plan, and both Hilton and Park Place agreed to specific contribution obligations with respect to funding the Plan. Amended Complaint ¶¶ 34-35.

- The Plan is a multiple-employer defined benefit pension plan sponsored by Hilton and administered by GBAC. Benefits under the Plan are based upon an employee's years of service and compensation. Amended Complaint ¶¶ 20-21.

- The Plan became effective on January 1, 1976 and was "frozen" for participant benefit accruals in 1996. However, even after the freezing of the Plan in 1996, plaintiffs allege that the employers of participants in the Plan, including Caesars, continued to have the obligation to fund or contribute to the Plan and ensure timely payment of the Plan participants' benefits upon retirement. Amended Complaint ¶¶ 22-23.

- Under the terms of the Allocation Agreement, both "Hilton and Park Place shall retain or assume, as applicable, all liabilities . . . relating to or arising under the Retirement Plan, including, without limitation, all liabilities for benefits accrued and payable thereunder to each participant thereunder, and for all costs of administering the Retirement Plan after the Distribution Date, in a proportion based upon the ratios of the accrued benefits of

Hilton Individuals and of Park Place Individuals . . . as of December 31, 1997."
Amended Complaint ¶ 36.

- The Allocation Agreement defines a "Park Place Individual" as "any individual who (a) is a Transferred Employee, (b) is otherwise a Park Place Employee, (c) is, as of the Distribution Date, a Hilton Terminee whose last employment with Hilton or a subsidiary of Hilton was with a Park Place Business or (d) is a dependent or beneficiary of any individual described in clause (a), (b), or (c)." Amended Complaint ¶ 37.

- Park Place's proportional contribution obligation based on the ratio of Park Place Individuals as of December 31, 1997 was 31.75 %. Amended Complaint ¶ 38.

- Under the Allocation Agreement, Park Place is "responsible for all liabilities incurred by Hilton or Park Place as a result of any . . . failure or other liability (including, without limitation, all liabilities relating to or arising out of the claims made by or on behalf of participants therein for, or with respect to, benefits under such Plan) with respect to Park Place Individuals." Amended Complaint ¶ 39.

- The Allocation Agreement further provides: "[T]o the extent that any liabilities incurred by Hilton or Park Place as a result of . . . any . . . liability which might be incurred with respect to such Plans (including, without limitation, all liabilities relating to or arising out of claims made by or on behalf of participants therein for, or with respect to, benefits under such Plan) are not directly or indirectly attributable to either Hilton Individuals or Park Place Individuals, then each of Hilton and Park Place shall be responsible for such liabilities in a proportion based upon the ratios of the accrued benefits of Hilton Individuals and of Park Place Individuals, respectively, under each such respective Plan, as of December 31, 1997." Amended Complaint ¶ 40.

- Like the Distribution Agreement, the Allocation Agreement provides that the remedy for any breach of the Allocation Agreement is "specific performance in addition to any other appropriate relief or remedy" and it also notes that "each party waives any objection to the imposition of such relief." Amended Complaint ¶¶ 42-44.

- In 2003, Park Place changed its name to Caesars Entertainment, Inc.  Amended Complaint ¶ 74.

- In 2005, Harrah's Entertainment, Inc. acquired Caesars Entertainment, Inc.  Amended Complaint ¶ 75.

- Thereafter, in 2007, Harrah's Entertainment, Inc. (now-known as CEC) filed a Form 10-K Annual Report with the SEC, stating "[w]ith our acquisition of Caesars, we assumed certain obligations related to the Employee Benefits and Other Employment Matters Allocation Agreement by and between Hilton Hotels Corporation and Caesars dated December 31, 1998, pursuant to which we shall retain or assume, as applicable, liabilities and excess, if any, related to the Hilton Hotels Retirement Plan based on the ratio of accrued benefits of Hilton employees and the Company's employees covered under the plan. Based on this ratio, our share of any benefit or obligation would be approximately 30 percent of the total. . . ." Amended Complaint ¶ 47.

- In its 2009 10-K Annual Report, Harrah's Entertainment, Inc. stated that "Hilton Hotels Corporation has informed the company that as of December 31, 2008, the plan benefit obligations exceeded the fair value of the plan assets by $61.0 million, of which $18.3 million is our share; however, no contributions to the plan were required during 2008, and no contributions are expected to be required for 2009." Amended Complaint ¶¶ 48-49.

- For several years after the spin-off transaction, neither Hilton nor Caesars was required to make additional contributions with respect to the Plan during that time period. Amended Complaint ¶ 51.
- In or around November 2010, Harrah's changed its name to CEC, its current corporate identity. Amended Complaint ¶ 77.
- Plaintiffs allege that at some point in 2010, both Hilton and Caesars were required to make contributions with respect to their respective obligations to fund the Plan. Amended Complaint ¶ 53.
- Plaintiffs further allege that in 2011, Hilton, but not Caesars, made regular contributions to the Plan in order to account for the benefit obligations of the Caesars individuals. Amended Complaint ¶ 54.
- Plaintiffs claim that CEC has failed to pay over $17.7 million with respect to these Plan benefit obligations. Plaintiffs further allege that CEC has declined Hilton's repeated requests that it make its required contributions with respect to the Plan. Amended Complaint ¶ 55.
- The parties' obligations under the Plan were affected by a class action lawsuit, titled *Kifafi v. Hilton Hotels Retirement Plan*, Civil Action No. 98-cv-01517 (the "*Kifafi* litigation"). The suit was filed in the United States District Court for the District of Columbia. Amended Complaint ¶ 57.
- The *Kifafi* litigation was brought against the Plan, Hilton Hotels Corporation (now known as Hilton Worldwide, Inc.) and individual members of the Plan Committee, alleging that the Plan's benefit formula was "backloaded" in violation of ERISA's benefit accrual rules and that the Plan participants' service for vesting purposes was improperly calculated. Amended Complaint ¶¶ 58-59.
- The facts and circumstances underlying the pension plan liabilities litigated in the *Kifafi* case existed prior to Hilton's "spin off" to Park Place. Amended Complaint ¶ 80.
- On May 15, 2009, summary judgment was awarded in the *Kifafi* litigation to the plaintiff on the backloading claim and certain vesting claims. As a result, the defendants in that litigation were required to implement a new, increased benefit formula and were directed to begin paying the higher benefits under the new benefit formula by January 1, 2012. Amended Complaint ¶¶ 61-63.
- As a result of the *Kifafi* litigation, Hilton contributed a "top-up" payment of approximately $25.9 million in the fourth quarter of 2013, inclusive of payments that plaintiffs allege Caesars was obligated to pay per the 31.75 % proportion of liabilities to the Plan that Caesars agreed to under the Allocation Agreement. Amended Complaint ¶ 65.
- The plan funding obligations arising from the *Kifafi* litigation are encompassed within the term "liabilities" as that term is used in Section 4.2 of the Allocation Agreement. Amended Complaint ¶ 66.
- Plaintiffs allege that CEC did not contribute any portion of the "top-up" payment to the Plan, nor did it commit to make future required contributions resulting from the court's ruling in *Kifafi*. Amended Complaint ¶ 67.
- In its 2011 10-K Annual Report, CEC stated that "[b]ased on the terms of the Allocation Agreement, the Company believes its maximum potential exposure is approximately 30 % to 33 % of the amount ultimately awarded as damages." Amended Complaint ¶ 68.

- In its 2014 10-K Annual Report, CEC stated that "[b]ased on the terms of the Allocation Agreement, we believed our maximum potential exposure . . . is approximately 30 percent to 33 percent of the amount ultimately awarded as damages." Amended Complaint ¶ 69.
- Plaintiffs allege that Hilton has made repeated demands that Caesars promptly pay all amounts Caesars was obligated to pay, and that Caesars acknowledge its obligation to pay its proportionate share of plan funding obligations in the future. Amended Complaint ¶ 71.
- Plaintiffs further allege that CEC is a "successor" to Park Place with respect to various employee benefits and other employment matters in connection with the "spin-off" on December 31, 1998. Amended Complaint ¶ 79.
- Plaintiffs further allege that as Park Place's successor, CEC had actual and/or constructive knowledge of the *Kifafi* litigation and the liabilities imposed as a result of the *Kifafi* litigation. Amended Complaint ¶ 82.
- Plaintiffs further allege that, at all relevant times, there was, and is, a continuity of business identity between, and among, Park Place and CEC because they, among other things, engaged in the same business operations and services, and utilized the same offices and employees. Amended Complaint ¶ 83.

Plaintiffs brought suit on December 24, 2014, asserting four causes of action: (i) Violation of ERISA § 302(a) & (b), (ii) breach-of-contract with respect to the Allocation Agreement, (iii) breach-of-contract with respect to the Distribution Agreement, and (iv) unjust enrichment.

## II.

Under Rule 8(a) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A district court should dismiss a complaint if, accepting all well-pleaded allegations in the complaint as true and drawing all reasonable factual inferences in the plaintiff's favor, the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. The factual allegations cannot be mere speculation, and must amount to more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Importantly, a formulaic recitation of the elements of a cause of action will not survive a motion to dismiss, nor will unadorned conclusory allegations.

*Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 679. Instead, the complaint must, consistent with Rule 11, Fed. R. Civ. P., allege facts sufficient to "nudge claims across the line from conceivable to plausible." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255-56 (4th Cir. 2009) (internal quotation marks and citations omitted). Finally, and particularly pertinent to this case, on a motion to dismiss, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

CEC contends that plaintiffs' claims must be dismissed both for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), Fed. R. Civ. P., and for failure to join a necessary and indispensable party pursuant to Rule 12(b)(7), Fed. R. Civ. P. CEC also urges, in the alternative, that this matter be transferred to the Northern District of Illinois pursuant to 28 U.S.C. § 1412, because CEOC's already-pending Chapter 11 case is being adjudicated in the Northern District of Illinois. For the reasons that follow, CEC's motion to transfer this case pursuant to 28 U.S.C. § 1412 is granted with respect to plaintiffs' breach-of-contract claims, as well as plaintiffs' ERISA claim. Additionally, CEC's motion to dismiss plaintiffs' unjust enrichment claim pursuant to Rule 12(b)(6), Fed. R. Civ. P. is also granted.

The focus of this Memorandum Opinion is chiefly CEC's motion to transfer pursuant to § 1412. Given this, and given that CEC's motion necessarily implicates some aspects of plaintiffs' breach-of-contract and ERISA claims, a brief discussion of those aspects is appropriate before moving to the merits of CEC's transfer motion.

## III.

### A.

A threshold issue is the choice of law governing plaintiffs' state law claims. But little ink need be spilled on this issue, as the parties correctly agree that New York law governs plaintiffs' state law claims.[3]

Under New York law, it is "well established that, generally, a party who is not a signatory to a contract cannot be held liable for breaches of that contract." *MBIA Ins. Co. v. Royal Bank of Canada*, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) (citing *Black Car & Livery Ins., Inc. v. H&W Brokerage, Inc.*, 28 A.D.3d 595 (N.Y. App. Div. 2006)). Yet, an exception to this general rule exists "when a non-signatory is found to have manifested an intent to be bound by the contract." *Id.* Thus, a "parent company can be held liable as a party to the subsidiary's contract if the parent's conduct manifests an intent to be bound by the contract." *Horsehead Indus's, Inc. v. Metallgesellschaft AG.*, 239 A.D.2d 171, 171-72 (N.Y. App. Div. 1997). Such intent is "inferable from the parent's participation in the negotiation of the contract, or if the subsidiary is a dummy for the parent, or if the subsidiary is controlled by the parent for the parent's own purposes." *Id.* at 172. Thus, in order for plaintiffs' breach-of-contract claims to

---

[3] Courts in New York "will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction." *Weisbach Elec. Corp. v. MasTec North America, Inc.*, 859 N.E.2d 498, 500 (N.Y. 2006). And here, both contracts at issue include choice of law provisions indicating that New York law governs. *See* Distribution Agreement § 9.04 ("This Agreement shall be governed and construed in accordance with the laws of the State of New York . . . ."); Allocation Agreement § 8.10 ("This Agreement . . . in all respects shall be interpreted, construed and governed by and in accordance with the laws of the State of New York . . . ."). Thus, New York's choice-of-law rules would apply that state's substantive law to this case and it is well-settled that "[f]ederal courts hearing state law claims under diversity or supplemental jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law." *McCoy v. Iberdola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014). As such, the choice-of-law clauses here must be given effect.

proceed against CEC, plaintiffs are required to allege facts to support a claim that CEC intended to be bound by the Agreements at issue either through its behavior, or alternatively, through its control and domination of CEOC, thereby establishing alter ego liability. The Amended Complaint, as it stands now, appears deficient in this respect and may be vulnerable to dismissal on this basis. To be sure, this defect may be cured by an amendment alleging additional facts.

But even if the Amended Complaint was rescued by an appropriate amendment, an important point to recognize in connection with CEC's transfer motion is that a prerequisite for both of plaintiffs' breach-of-contract claims against CEC is subsidiary liability, *i.e.*, that CEOC is liable on the Agreements at issue. This means, to put the point colloquially, that CEOC has "skin in the game" regarding plaintiffs' breach-of-contract claims. Indeed, this point gives rise to yet another basis on which plaintiffs' breach-of-contract claims may be vulnerable to dismissal. Rule 12(b)(7), Fed. R. Civ. P. provides that dismissal is warranted in the absence of a necessary and indispensable party pursuant to Rule 19, Fed. R. Civ. P. Here, because plaintiffs' breach-of-contract claims against CEC necessarily implicate CEOC's liability on the contracts at issue, it follows that CEOC is likely both a necessary and indispensable party, which may warrant dismissal pursuant to Rule 12(b)(7). Although no result is reached here on either 12(b)(6) or 12(b)(7) grounds, the important point to recognize is that plaintiffs' breach-of-contract claims against CEC require first finding CEOC liable, a factor that is relevant to the transfer calculus.

## B.

CEC's motion to dismiss plaintiffs' ERISA claim also raises issues pertinent to the transfer motion. A threshold issue requiring resolution with respect to plaintiffs' ERISA claim, although not pertinent to the transfer motion, is CEC's contention that the Plan always met the

minimum funding standard. It is settled that "ERISA mandates that covered pension plans . . . must meet the statutory minimum funding standard in each fiscal year." *Gastronomical Workers Union Local 610 & Metropolitan Hotel Ass'n Pension Fund v. Dorado Beach Hotel Corp.*, 617 F.3d 54, 58 (1st Cir. 2010).[4] Thus, an employer's failure to "make contributions required for this purpose . . . may be enforced by means of a civil action . . . ." *Id.* at 60.[5] In other words, stating an ERISA claim under 29 U.S.C. § 1082(a) requires alleging that the relevant plan did not meet the statutorily mandated minimum funding standard. It appears in this case that the Plan has always met the minimum funding standard.[6] Thus, in order for plaintiffs' ERISA claim to survive threshold dismissal, plaintiffs would have to plead facts that support the existence of an immediate and imminent threat of the Plan failing to meet the minimum funding standard. Of course, plaintiffs may be able to amend to add such facts, but this issue need not be reached or decided here in view of the result reached with respect to plaintiffs' transfer motion.

Also not pertinent to the transfer motion is whether CEC is a participating employer to the Plan. It is well-settled that only participating employers are required to contribute to the Plan. *See* 29 U.S.C. § 1082(b)(1) ("[T]he amount of any contribution required by this section . . . shall be paid by the employer responsible for making contributions to or under the plan."). CEC

---

[4] *See also* 29 U.S.C. § 1082(a)(1)("A plan to which this part applies shall satisfy the minimum funding standard applicable to the plan for any plan year.").

[5] *See also McMahon v. McDowell*, 794 F.2d 100, 107 (3d Cir. 1986) ("If an employer nonetheless refuses to make the required plan contributions, ERISA also permits a civil action to be brought in order to enforce the provisions of the statute and of the plan.").

[6] *See* Form 5500 (CEC's Memorandum in Support of its Motion to Dismiss, Ex. I) at 7 ("The Plan has met the minimum funding requirements for the years ended December 31, 2013 and 2012."). Notably, this is a publicly-available document, and, as such, judicial notice of this document is appropriate. *See Yates v. Municipal Mortg. & Equity, LLC* , 744 F.3d 874, 881 (4th Cir. 2014) ("[W]e take judicial notice of the content of relevant SEC filings and other publicly available documents included in the record.").

contends that there is no document or evidence listing CEC, CEOC, or Park Place as participating employers in the Plan.  Indeed, the Plan itself includes a full list of the participating employers and CEC, CEOC, and Park Place are all conspicuously absent from that list.  Plaintiffs argue in response that the Allocation Agreement establishes CEC's obligations to the Plan as a participating employer.  In any event, this dispute is immaterial to the pending transfer motion and it is not decided here.

Importantly, however, one aspect of plaintiffs' ERISA claim is inextricably intertwined with the issues raised by the transfer motion and is therefore addressed here.  Plaintiffs contend that CEC and CEOC are jointly and severally liable for the amounts they allegedly owe to the Plan.  But imposition of joint and several liability on two or more employers in a single controlled group under ERISA requires a predicate finding that one of the employers had a duty to contribute to the plan at issue.  To be sure, 29 U.S.C. § 1082(b)(2) states that "each member of such [controlled] group shall be jointly and severally liable for payment of such contributions." But plaintiffs fail to account for the provision's preamble, which states that the provision *only* applies "*if* the employer referred to in paragraph (1) is a member of a controlled group." *Id.* (emphasis added).  In relevant part, paragraph (1) states that the "amount of any contribution required by this section . . . shall be paid by the *employer responsible for making contributions to or under the plan.*" 29 U.S.C. § 1082(b)(1) (emphasis added).  Thus, joint and several liability attaches *only* after a predicate finding that one of the employers in the controlled group is responsible for making contributions to or under the plan.   As such, like plaintiffs' breach-of-contract claims, plaintiffs' ERISA claim will necessarily adjudicate CEOC's liability on the Agreements at issue, which, in part, is why transferring this case is in the interests of justice and why CEOC is likely a necessary and indispensable party to this suit pursuant to Rule 19, Fed. R.

Civ. P. In sum, an examination of plaintiffs' breach-of-contract and ERISA claims compels one conclusion: these claims all require a threshold examination of CEOC's liability, which is why, with respect to these claims, CEOC has "skin in the game."

## IV.

CEC seeks to transfer this case to the Northern District of Illinois pursuant to 28 U.S.C. § 1412, which provides that: "A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." Before proceeding to consider the transfer calculus, *i.e.*, whether transfer would be in the interest of justice or for the convenience of the parties, two predicate issues must be resolved: (i) whether the Northern District of Illinois would have subject matter jurisdiction over this case if it were transferred to that district; and (ii) whether § 1412 applies given that this case is not a case or proceeding that arises under Title 11.

### A.

Section 1334(b), provides that "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in *or related to cases* under title 11." 28 U.S.C. § 1334(b) (emphasis added). This statute governs whether the Northern District of Illinois would have jurisdiction over this case if it is transferred to that district. Thus, resolving this jurisdictional inquiry requires determining whether the present case is "related to" CEOC's already-pending Chapter 11 proceeding in the Northern District of Illinois.

There is substantial precedent on the scope of "related to" jurisdiction. In this regard, the Fourth Circuit has held that a

> civil case filed in a district court is related to a case in bankruptcy if the outcome in the civil case "*could conceivably have any effect on the estate being administered in bankruptcy* . . . if the out-come could alter the debtor's rights,

> liabilities, options, or freedom of action . . . and which in any way impacts upon
> the handling and administration of the bankrupt estate."

*New Horizon of NY LLC v. Jacobs*, 231 F.3d 143, 151 (4th Cir. 2000) (citing *Celotex Corp. v.
Edwards*, 514 U.S. 300, 308 n.6 (1995)). The rationale for this statutory grant of "related to"
jurisdiction stems from Congress's intent "to grant comprehensive jurisdiction to the bankruptcy
courts so that they might deal efficiently and expeditiously with all matters connected with the
bankruptcy estate." *Celotex*, 514 U.S. at 308 (internal quotation marks and citations omitted).
Accordingly, the Fourth Circuit has adopted the rule that a "district court and derivatively the
[b]ankruptcy court has jurisdiction over an action related to a bankruptcy case." *New Horizon*,
231 F.3d at 151 (internal quotation marks and citations omitted). By way of illustration, the
Supreme Court in *Celotex* noted that "suits between third parties which have an effect on the
bankruptcy estate" would be "related to" a bankruptcy case. *Celotex*, 514 U.S. at 307 n.5. And
importantly, a "related to case need not necessarily be against the debtor or his property." *New
Horizon*, 231 F.3d at 151. One bankruptcy court in this district has noted that "a suit by a
creditor against guarantors of obligations where the primary obligor is a debtor in a Chapter 11
case pending before the Court . . . is 'related to' the [b]ankruptcy case." *In re Brookland Park
Plaza, LLC*, No. 09-34495, 2009 WL 3297801 at *1 (Bankr. E.D. Va. Oct. 13, 2009). This is so
because the "outcome of this proceeding could conceivably have an effect on the bankruptcy
estate's administration." *In re Commonwealth Sprinkler Co., Inc.*, 296 B.R. 694, 697 (Bankr.
E.D. Va. 2001). Thus, in *Commonwealth Sprinkler*, the bankruptcy court found that a suit
against multiple guarantors of a debt was "related to" the bankruptcy proceeding because a
"successful recovery against the guarantors would directly reduce the amount claimed in the
proof of claim and free potential assets to be paid to other creditors." *Id.* In sum, although not

limitless,[7] "related to" jurisdiction is appropriately broad, sensibly extending a bankruptcy court's jurisdiction to any civil case that, in the Fourth Circuit's words, "could conceivably have any effect on the estate being administered in bankruptcy." *New Horizon*, 231 F.3d at 151.

This case fits squarely within this principle; plaintiffs' claims against CEC in this case could well affect the CEOC bankruptcy estate now being administered in the Bankruptcy Court in the Northern District of Illinois. For example, if plaintiffs were to prevail against CEC on the breach-of-contract or ERISA claims in this case, that would then "free potential assets to be paid to other creditors" of CEOC. *Commonwealth Sprinkler*, 296 B.R. at 697. Oddly enough, a loss by plaintiffs in this case may have the same effect on the CEOC bankruptcy estate. To succeed on the breach-of-contract claims here against CEC, plaintiffs must establish CEOC's liability as a predicate. If plaintiffs fail in this regard, that result may foreclose recovery on the similar pending claim in the Illinois bankruptcy proceeding, which in turn might well affect the administration of CEOC's bankruptcy estate.

Similarly, resolution of plaintiffs' ERISA claim here may well affect the administration of CEOC's bankruptcy estate. Plaintiffs' ERISA claim asserts that CEC and CEOC are jointly and severally liable for plaintiffs' losses. If plaintiffs prevail on a joint and several liability theory, then they would be free to recover the entire amount of ERISA damages from either CEC or CEOC. Either scenario would affect CEOC's bankruptcy estate, as CEOC would either be responsible for 100 % or 0 % of the ERISA damages, depending on the amount of such damages collected from or paid by CEC. And of course, if plaintiffs' theory of liability is ultimately unsuccessful, then plaintiffs would be foreclosed from recovering against CEOC under their

---

[7] *See Celotex*, 514 U.S. at 308 ("[A] bankruptcy court's 'related to' jurisdiction cannot be limitless.").

ERISA claim in the bankruptcy court, which, of course, also might affect the administration of CEOC's bankruptcy estate.

Plaintiffs' arguments in support of their contention that "related to" jurisdiction does not exist here are unpersuasive and based on two cases, both of which are distinguishable.

First, plaintiffs contend that "related to" jurisdiction is lacking because the present suit would not "automatically trigger"[8] liability on the part of CEOC or otherwise threaten any of CEOC's assets. But this argument relies on the wrong standard. The correct standard is not whether this action would automatically trigger liability, but rather, as the Fourth Circuit has stated, whether "the outcome of [the civil] proceeding could *conceivably* have any effect on the estate being administered in bankruptcy." *New Horizon*, 231 F.3d at 151 (emphasis added) (internal quotation marks and citations omitted). Thus, neither the automatic triggering of CEOC's liability nor threats to CEOC's assets are relevant considerations to whether "related to" jurisdiction exists; rather, the standard is whether the outcome of the civil proceeding could conceivably have any effect on the administration of the bankruptcy estate. That test is met here.

Second, plaintiffs rely on *Southern Co. Energy Mktg., L.P. v. Va. Elec. & Power Co.*, 190 F.R.D. 182 (E.D. Va. 1999) as authority that the current suit is not "related to" CEOC's Chapter 11 proceeding. In *Southern Co.*, the defendant sought dismissal under Rule 12(b)(7) on the ground that a third party then in bankruptcy was a necessary party under Rule 19. *Id.* at 183. The district court disagreed, and in the process held that the suit in the district court was not "related to" the bankruptcy proceeding because the "outcome of [the] case [would] have no effect on [the third party's] estate, as any judgment here will not create, destroy, or modify any . . . rights, obligations, liabilities, or assets." *Id.* at 190. Critical to the outcome in *Southern Co.*,

---

[8] Plaintiffs' Memorandum in Opposition to CEC's Motion to Dismiss at 24.

however, is the fact that the parties' claims were based on "**different contracts** between different parties." *Id.* at 188-89 (emphasis added). That is not true of this case and thus it cannot be said of this case, as it was of *Southern Co.*, that the outcome of this case would have no conceivable effect on CEOC's bankruptcy estate.

Plaintiffs' reliance on *Pacor, Inc v. Higgins*, 743 F.2d 984 (3d Cir. 1984) is similarly misplaced because the plaintiff in *Pacor* asserted no pending creditor claim against the non-party debtor's estate and hence a judgment in that case could not affect the debtor's estate. *See id.* at 995-96. ("Higgins is not a creditor of Manville and has filed no claim against Manville. Any judgment obtained would thus have no effect on the arrangement, standing, or priorities of Manville's creditors."). By contrast, here, plaintiffs are creditors in CEOC's Chapter 11 case, and plaintiffs' breach-of-contract and ERISA claims against CEC depend upon threshold determinations of CEOC's obligations under the Agreements at issue, "thus altering the liabilities of the . . . bankruptcy estate." *In re Celotex Corp.*, 124 F.3d 619, 626 (4th Cir. 1997). In sum, this case is "related to" CEOC's already-pending Chapter 11 suit and thus the Illinois bankruptcy court would have jurisdiction over this case if it is transferred to that court.

## B.

The next step in the transfer analysis is to address the question of whether § 1412 applies to the transfer of an action "related to" a bankruptcy proceeding where, as here, the action is not a "case or proceeding under Title 11." 28 U.S.C. § 1412. This is a much-litigated question in the district courts, which appear to be divided on the issue and no court of appeals appears to have addressed the question. One side of the debate argues that § 1412 authorizes district courts to transfer only cases under Title 11 and that non-Title 11 cases "related to" bankruptcy

proceedings may be transferred only pursuant to § 1404(a), the general transfer statute.[9]  The

other side of the debate—represented by the leading case of *Dunlap v. Friedman's, Inc.*, 331

B.R. 674 (S.D. W.Va. 2005)—holds that § 1412 allows district courts to transfer non-Title 11

"related to" cases to the district where the related bankruptcy proceedings are underway.[10]

Although both sides of this debate, as reflected in the cases, advance substantial arguments, a

careful review of these arguments points persuasively to the conclusion that *Dunlap*'s result and

reasoning are correct.[11]  Notably, the leading bankruptcy law treatise, Collier on Bankruptcy,

also reaches the same conclusion. *See* 1 Collier on Bankruptcy ¶ 4.04 [1] (15th ed. Rev. 2005)

("Section 1412 of title 28 applies to changes of venue both of (a) cases under Title 11 and (b)

civil proceedings . . . arising in or related to cases under title 11 . . . A few courts treat related

claims and causes of action somewhat differently for change-of-venue purposes, a conclusion not

---

[9] *See, e.g.*, *Rumore v. Wamstad*, No. Civ. A. 01-2997, 2001 WL 1426680 at *2 (E.D. La. Nov. 13, 2001) ("The plain meaning of this statute dictates that in order to transfer under this statute, the district court first must have jurisdiction of a case *under* Title 11.  The language of this statute contains no reference to 'related to' proceedings."); *Tultex Corp. v. Freeze Kids, L.L.C.*, 252 B.R. 32, 35-36 (S.D.N.Y. 2000) (same).

[10] *See, e.g.*, *Dunlap*, 331 B.R. at 680 ("[T]he court concludes that section 1412 is the appropriate statute for venue transfer purposes in this related-to action."); *In re Bruno's, Inc.*, 227 B.R. 311, 322-23 (Bankr. N.D. Ala. 1998) (same).

[11] *See Brown v. Wells Fargo, N/A*, 463 B.R. 332, 338 (M.D.N.C. 2011) ("Like other courts, this Court finds the reasoning in *Dunlap* persuasive and thus will consider [the] Motion for Change of Venue under 28 U.S.C. § 1412); *Creekridge Capital, LLC v. La. Hosp. Ctr., LLC*, 410 B.R. 623, 628 (D. Minn. 2009) ("This Court adopts the analysis in *Dunlap*, which thoroughly explains the well-grounded reasons supporting the conclusion that a motion to transfer an action related to a bankruptcy proceeding in another forum is appropriately analyzed under § 1412."); *Quick v. Viziqor Sol's, Inc.*, No. 4:06cv637SNL, 2007 WL 494924 at *3 (E.D. Mo. Feb. 12, 2007) ("Having reviewed the relevant caselaw, this Court finds that § 1412 governs the issue of venue transfer in this 'related to' action for the excellent reasons set forth in *Dunlap* . . . ."). The result reached in *Dunlap* and here also comports with the sensible principle that the court in which a bankruptcy proceeding is pending should be, if possible, the proper venue for all related litigation.  Moreover, a determination that § 1412 is inapplicable to "related to" proceedings would render § 1412 somewhat impotent, as district courts, as contrasted with bankruptcy courts, relatively rarely have Title 11 cases pending before them.

to be recommended.").[12]   In summary, therefore, § 1412 allows district courts to transfer non-

title 11 cases to a district court where a bankruptcy proceeding is underway if the result of that

case might affect the administration of the bankruptcy estate.[13]

## C.

Because "related to" jurisdiction exists, and because § 1412 is applicable,[14] it is now

appropriate to address the transfer calculus required by § 1412.   Under that section, a district

court may transfer a case "in the interest of justice or for the convenience of the parties." 28

U.S.C. § 1412.   Although § 1412 is a disjunctive provision, allowing for transfer in the interest of

justice *or* for the convenience of the parties, both of these criteria are now addressed.

The "'interest of justice' component of § 1412 is a broad and flexible standard which must be

applied on a case-by-case basis." *In re Manville Forest Products, Corp.*, 896 F.2d 1384, 1391

(2d Cir. 1990).   In evaluating whether transfer is in the interests of justice under § 1412, courts

---

[12] Although the Fourth Circuit has not expressly spoken on this issue, it has hinted that § 1412 governs the transfer of "related to" actions. In *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1011 (4th Cir. 1996) the Fourth Circuit stated that Section 157(b)(5) of Title 28—which allowed a district court sitting in bankruptcy to fix the venue of any tort case pending against the debtor in other districts—was limited to "personal injury tort claims against a debtor in Chapter 11 proceedings wherever pending . . . ." In reaching this conclusion, the Fourth Circuit also stated that: "[i]n *all* other cases related to the bankruptcy proceedings, however, the general statute (*i.e.*, section 1412) would govern." *Id.* (emphasis added).

[13] Importantly, some courts have conflated whether "related to" jurisdiction exists with whether a matter is core or non-core under the Bankruptcy Code. But the Code itself specifically states that "[a] bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under Title 11." 28 U.S.C. § 157(c)(1). Thus, whether a suit is "related to" a pending bankruptcy is a threshold question of subject matter jurisdiction, while whether a proceeding is core or non-core affects whether the bankruptcy judge may enter appropriate orders and judgments, only after it is determined that jurisdiction is proper.

[14] To be sure, § 1404(a) might in another context be an option for transfer. In this instance, however, § 1404(a) could not be utilized because this case could not "have been brought" originally in the Northern District of Illinois.

examine a number of factors, including (i) the economic administration of the bankruptcy estate; (ii) the presumption in favor of trying cases "related to" a bankruptcy case in the court in which the bankruptcy is pending; (iii) judicial efficiency; (iv) the ability to receive a fair trial; (v) the state's interest in having local controversies decided within its borders; (vi) enforceability of any judgment rendered; and (vii) the plaintiff's original choice of forum. *See Blanton v. IMN Fin. Corp.*, 260 B.R. 257, 266 (M.D.N.C. 2001). Equal weight is not given to all the factors in this calculus; indeed "[t]he most important of these factors is . . . the economic and efficient administration of the estate." *Dunlap*, 331 B.R. at 680 (citing 1 Steinberg, Bankruptcy Litigation §§ 2:4; 2:6 (2005)).

In this case, the interests of justice clearly weigh in favor of transferring plaintiffs' breach-of-contract and ERISA claims. Transfer would promote the economic and efficient administration of CEOC's bankruptcy estate, as plaintiffs' claims against CEC directly impact CEOC's liability and the value of CEOC's estate in the already-pending bankruptcy proceeding. As noted in part III, *supra*, plaintiffs' breach-of-contract and ERISA claims against CEC necessarily involve the predicate determination of CEOC's liability on those same claims. Such a determination would affect the value of CEOC's bankruptcy estate, especially given that plaintiffs are already creditors in CEOC's Chapter 11 case. Thus, the most important factor in the § 1412 analysis— the economic and efficient administration of the bankruptcy estate—weighs firmly in favor of transfer.

Similarly, judicial efficiency is served by litigating the same legal issue only once, instead of duplicatively litigating CEOC's liability under the Agreements in two different fora. Because plaintiffs' breach-of-contract and ERISA claims against CEC necessarily implicate CEOC's liability, the potential for inconsistent judicial rulings exists were this case to move forward

19

without CEOC.  Consequently, this factor also weighs convincingly in favor of transfer under §
1412.

The remaining § 1412 factors also favor transfer.  First, the "home court" presumption
reinforces the result reached here.[15]  Meanwhile, plaintiffs have proffered no evidence that they
would be unable to receive a fair trial in Illinois, nor does this district have a compelling interest
in having this case decided in this district.  Although plaintiffs' choice of this forum is
understandable and entitled to careful consideration, the other factors weighed here, including
the potential for inconsistent legal rulings and judicial economy concerns, are sufficient to
override this choice.

Plaintiffs rely heavily on *Bd. of Trustees, Sheet Metal Workers Nat. Fund v. Baylor Heating
& Air Conditioning, Inc.*, 702 F. Supp. 1253 (E.D. Va. 1998) to oppose CEC's § 1412 motion.
In *Baylor*, the district court noted that in "ERISA cases, there is a further policy rationale in
favor of according plaintiff's choice of forum somewhat greater weight than would typically be
the case" owing to Congressional recognition that ERISA beneficiaries should have broad
remedies for violations of the Act.  *Id.* at 1256.  Importantly, however, the venue transfer issue
litigated in *Baylor* was carried out under § 1404, and under § 1404, a "plaintiff's choice of venue
is entitled to substantial weight in determining whether transfer is appropriate." *Id.*  Moreover,
even if plaintiffs' choice of forum were to be afforded "somewhat" greater weight in this case,
ample persuasive reasons exist to disturb this choice, namely avoidance of inconsistent legal
rulings on the same issue, judicial economy, and efficient administration of the bankruptcy

---

[15] *See, e.g., Marquette Transp. Co. v. Trinity Marine Prod's, Inc., et al.*, 2006 WL 2349461 at *4
(E.D. La. Aug. 11, 2006) ("This Court finds persuasive the argument that in enacting section
1412, Congress did not intend to otherwise hamper the well settled principle that the court in
which the bankruptcy case itself is pending is the proper venue for adjudicating all related
litigation.") (internal quotation marks and citations omitted).

estate. Thus, transfer of this case is in the interests of justice pursuant to § 1412.[16] For similar reasons, plaintiffs' reliance on *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Boeser, Inc.*, No. 1:14cv1458, 2015 WL 402992 at \*2 (E.D. Va. Jan. 28, 2015) is unavailing, as that case also evaluated whether to transfer an ERISA case under § 1404 instead of § 1412. Importantly, neither *Baylor* nor *Boeser* involved a suit related to a pending bankruptcy proceeding.

Although it is unnecessary to evaluate whether transfer would be convenient for the parties, given the disjunctive nature of § 1412, it is worth noting that plaintiffs' assertion that transfer to the Northern District of Illinois would be inconvenient is undermined considerably by the fact that they are already parties to CEOC's pending Chapter 11 case in that district.

In sum, transfer of this case is warranted under § 1412.

## V.

The decision to transfer plaintiffs' breach-of-contract and ERISA claims does not end plaintiffs' case in this District, as plaintiffs have also asserted an unjust enrichment claim.

It is well-settled that under New York law, unjust enrichment is a "quasi-contract claim designed to prevent 'a person [from] enrich[ing] himself unjustly at the expense of another." *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 449, 443 (E.D.N.Y. 2011). A claim for unjust enrichment requires that: (1) the defendant was enriched; (2) that the enrichment was at the plaintiffs' expense; and (3) that the circumstances are such that in equity and good conscience

---

[16] Since defendant filed the motion to transfer plaintiffs' claims under § 1412, the result reached here forecloses defendant from raising a personal jurisdiction objection in the Northern District of Illinois. *See Bruce Lee Enter's, LLC v. A.V.E.L.A., Inc.*, No. 10 Civ. 2333 (LTS), 2011 WL 1327137 at \*3 (S.D.N.Y. Mar. 31, 2011) (Noting that because defendants took the position that transfer to a different forum was warranted, they "necessarily, although implicitly, argued that this Court had personal jurisdiction over them at the time [p]laintiff originally filed suit").

the defendant should return the money or property to the plaintiff. *See Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 202 (S.D.N.Y. 2011). In general, an unjust enrichment claim can ordinarily only be maintained "in the absence of a valid, enforceable contract." *Id.* Indeed, "decisions both in New York state courts and in this district have consistently held that claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute **even if one of the parties to the lawsuit is not a party to the contract.**" *Id.* (emphasis added).[17]

Straightforward application of these principles requires dismissal of plaintiffs' unjust enrichment claim, as a valid and enforceable contract exists between plaintiffs and CEOC, precluding plaintiffs' quasi contract claim against CEC, a third party nonsignatory. Remarkably, plaintiffs, in their response brief, leave this argument unrefuted. In sum, plaintiffs' unjust enrichment claim must be dismissed with prejudice pursuant to Rule 12(b)(6), Fed. R. Civ. P., for failing to state a claim upon which relief can be granted.

## VI.

In summary, for the reasons stated, defendant's motion to dismiss must be granted with respect to plaintiffs' unjust enrichment claim. The remaining aspects of defendant's motion to dismiss are neither reached nor decided. And defendant's motion to transfer plaintiffs'

---

[17] *See also American Medical Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800, 2007 WL 683974 at *10 (S.D.N.Y. Mar. 5, 2007) (same); *Diversified Carting, Inc. v. City of New York*, No. 04 Civ. 9507 (HB), 2006 WL 147584 at *9 (S.D.N.Y. Jan. 20, 2006) ("Generally, the existence of an express agreement bars a quasi contract claim concerning the subject matter covered by that express agreement . . . This rule applies even when a plaintiff asserts claims based in quasi contract against a non party to the express agreement."); *Bellino Schwartz Padob Advertising, Inc. v. Solaris Marketing Group, Inc.*, 222 A.D.2d 313 (N.Y. App. Div. 1995) ("The existence of an express contract . . . governing the subject matter of the plaintiff's claim also bars any quasi-contractual claims against defendant . . . as a third party nonsignatory to the valid and enforceable contract between those parties . . . .").

remaining claims—the breach-of-contract and ERISA claims—pursuant to § 1412 must be granted, and this matter must be transferred to the Northern District of Illinois.

An appropriate Order will issue.

Alexandria, VA
April 14, 2015

_____
T. S. Ellis, III
United States District Judge